14-4261-cv
*Securities and Exchange Commission v. Miller, et al.*

# In the
# United States Court of Appeals
## for the Second Circuit

———

AUGUST TERM 2014

———

No. 14-4261-cv

———

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

*v.*

DONALD R. MILLER, JR., in his capacity as the Independent Executor
of the Will and Estate of Charles J. Wyly, Jr. also known as Charles J.
Wyly, Jr., DAVID MATTHEWS, LISA WYLY, KELLY WYLY O'DONOVAN,
ANDREW WYLY, CHARLES J. WYLY, III, JENNIFER WYLY LINCOLN,
JAMES W. LINCOLN, CHERYL WYLY, EVAN ACTON WYLY, LAURIE WYLY
MATTHEWS, MARTHA WYLY MILLER, DONALD R. MILLER, JR., EMILY
WYLY, CHRISTIANA WYLY, JOHN GRAHAM,

*Defendants-Appellants,*

SAMUEL E. WYLY, LOUIS J. SCHAUFELE, III, MICHAEL C. FRENCH,
CAROLINE D. WYLY, EMILY WYLY LINDSEY,

*Defendants.*

———————

Appeal from the United States District Court for the
Southern District of New York

No. 1:10-cv-5760—Shira A. Scheindlin, *Judge*

———————

ARGUED: JUNE 24, 2015
DECIDED: DECEMBER 18, 2015

———————

Before: CABRANES, POOLER, and DRONEY, *Circuit Judges*.

———————

Appeal from a District Court order temporarily freezing assets
adjudged to be ill-gotten gains from a securities fraud scheme
perpetrated by defendants Samuel and Charles Wyly. The question
presented is whether an asset freeze order obtained by the Securities
and Exchange Commission constituted an action to collect on an
anticipated money judgment and therefore violated the automatic
stay provision of the Bankruptcy Code, 11 U.S.C. § 362, and this
Court's precedent in *SEC v. Brennan*, 230 F.3d 65 (2d Cir. 2000).

We hold that the entry of the asset freeze order by the United
States District Court for the Southern District of New York (Shira A.

Scheindlin, *Judge*) did not violate the Bankruptcy Code's automatic stay. The order fell within the "governmental unit" exception to the automatic stay provision, did not constitute impermissible "enforcement of a money judgment," and did not run afoul of *Brennan*. We also conclude that it was properly supported by a showing of ill-gotten gains as to nine of the sixteen Relief Defendants. Accordingly, we **AFFIRM** in part the District Court's November 3, 2014 asset freeze order insofar as it restrained the assets of these nine Relief Defendants. Because, however, we are unable to determine on the record before us whether sufficient evidence supports imposition of the order against the remaining seven Relief Defendants, the cause is **REMANDED** to the District Court, with instructions to conduct additional factual development on that limited issue and such further proceedings as may be appropriate and consistent with this opinion. In the interest of judicial economy, any future appeals taken from the District Court's decisions shall be referred to this panel.

─────────

DANIEL STAROSELSKY (Anne K. Small, Michael A. Conley, John W. Avery, Randall W. Quinn, Hope Hall Augustini, *on the brief*), Securities and Exchange Commission, Washington, DC, *for Plaintiff-Appellee*.

DAVID L. KORNBLAU (Eric Hellerman, Evie Spanos *on the brief*), Covington & Burling

LLP, New York, NY, *for Defendants-Appellants.*

---

JOSÉ A. CABRANES, *Circuit Judge*:

This appeal arises out of a civil enforcement action brought by the Securities and Exchange Commission ("SEC") against defendants Samuel Wyly and Charles Wyly, Jr. (the "Wyly Brothers"). After a jury found the Wyly Brothers liable for multiple claims of securities fraud, the United States District Court for the Southern District of New York (Shira A. Scheindlin, *Judge*) ordered payment of approximately $300 million in disgorgement. Fearing the dissipation of ill-gotten gains among the Wyly Brothers' family members, the SEC requested that the District Court enter a temporary asset freeze. While that request was pending before the District Court, Samuel Wyly and the widow of Charles Wyly filed petitions for Chapter 11 protection in Bankruptcy Court, triggering the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362. Shortly thereafter, the District Court entered the requested order freezing the Wyly Brothers' ill-gotten gains, including assets transferred to multiple family members, who are named Relief Defendants in this action.

This appeal does not challenge the liability judgment against the Wyly Brothers or the damages award. Instead, defendants-appellants challenge only the validity of the asset freeze order, which they assert was issued in violation of the Bankruptcy Code's

automatic stay provision, as interpreted by this Court in *SEC v. Brennan*.[1]

We hold that the entry of the asset freeze order did not violate the Bankruptcy Code's automatic stay. The order fell within the "governmental unit" exception to the automatic stay provision, did not constitute impermissible "enforcement of a money judgment," and did not run afoul of *Brennan*. We also conclude that it was properly supported by a showing of ill-gotten gains as to nine of the sixteen Relief Defendants. Accordingly, we **AFFIRM** in part the District Court's November 3, 2014 asset freeze order insofar as it restrained the assets of these nine Relief Defendants. Because, however, we are unable to determine on the record before us whether sufficient evidence supports imposition of the order against the remaining seven Relief Defendants, the cause is **REMANDED** to the District Court, with instructions to conduct additional factual development on that limited issue and such further proceedings as may be appropriate and consistent with this opinion. In the interest of judicial economy, any future appeals taken from the District Court's decisions shall be referred to this panel.

---

[1] 230 F.3d 65 (2d Cir. 2000).

## BACKGROUND

### I.  Facts and Trial Evidence

Although the case against the Wyly Brothers was complex,[2] the facts relevant to the instant appeal are relatively straightforward. Samuel Wyly and Charles Wyly were officers, directors, and shareholders of four publicly traded corporations.  Beginning in the early 1990s, the Wyly Brothers transferred millions of stock options received from those corporations to an extensive system of offshore trusts and subsidiary entities in the Isle of Man ("IOM"), a self-governing British Crown dependency in the Irish Sea.  For the next dozen years, the IOM trusts exercised those options and traded in the securities, while the Wyly Brothers failed to properly disclose their beneficial ownership.  The undisclosed transactions numbered in the hundreds and returned profits of more than $550 million.

On July 29, 2010, the SEC initiated a civil enforcement action against the Wyly Brothers, asserting multiple claims of securities fraud.  The District Court bifurcated the liability and remedies phases of the case.  In May 2014, following a six-week trial, a jury returned a verdict finding the Wyly Brothers liable for nine claims of securities fraud, involving the violation of multiple antifraud, registration, and reporting provisions of federal law.  Following a

---

[2] *See generally SEC v. Wyly*, 33 F. Supp. 3d 290 (S.D.N.Y. 2014); *SEC v. Wyly*, 950 F. Supp. 2d 547 (S.D.N.Y. 2013); *SEC v. Wyly*, 788 F. Supp. 2d 92 (S.D.N.Y. 2011).

separate bench proceeding, the District Court dismissed a tenth claim of insider trading. According to trial evidence, the Wylys used the IOM trusts from 1992 to 2005 to trade in secret without making the requisite disclosures, to protect their assets from creditors, and to avoid taxes on trading profits earned. Evidence adduced at trial also indicated that some of the proceeds from the IOM trusts flowed to family members of the Wyly Brothers.

## II. Post-Trial Procedural History

Following the jury's liability determination, the District Court entered a complex remedies phase to quantify the Wylys' ill-gotten gains and to determine whether and how much the Wylys should be required to disgorge. In the remedies phase, which was tried to the bench, the SEC proposed seven theories pursuant to which the Wyly Brothers should be required to pay disgorgement.

Ultimately, the District Court accepted two alternative measures of the Wyly Brothers' disgorgement liability in separate opinions of September 24, 2014 (the "September disgorgement opinion") and December 19, 2014 (the "December disgorgement opinion").[3] In its September disgorgement opinion, the District Court treated as a reasonable measure of disgorgement the "amount equivalent to the taxes avoided on the profits the Wylys realized on

---

[3] The District Court rejected outright several other theories of disgorgement as counterfactual or untimely, and the SEC voluntarily withdrew one disgorgement theory.

the sale of Issuer securities."[4]  The District Court emphasized that the tax figure represented merely a "measure of disgorgement," *not* an independent assessment of the Wyly Brothers' tax liability, which the Court recognized would be determined in a separate "IRS civil proceeding."[5]  The September disgorgement opinion also ordered disgorgement of a certain percentage on profits of trading unregistered securities.  In total, it ordered disgorgement of $299,357,243.80.[6]

The December disgorgement opinion set forth an alternative calculation, to be used *only if* the September disgorgement measure later failed on appeal.  This alternative calculation measured the unjust enrichment as the difference between the Wyly Brothers' rate of return from their offshore trading and the average market rate of return for those stocks during the relevant period.  In other words, this calculation "compare[d] the Wylys' rate of return to that of an average buy-and-hold investor," and thereby "reasonably approximate[d] the economic value of the Wylys' securities violations—their ability to trade in secret while having an

---

[4] *SEC v. Wyly*, 56 F. Supp. 3d 394, 431 (S.D.N.Y. 2014).

[5] *Id.* at 427, 431.  The District Court explicitly indicated that "any amounts disgorged in this case should be credited towards any subsequent tax liability determined in an IRS civil proceeding as a matter of equity."  *Id.* at 427.

[6] The September disgorgement opinion ordered disgorgement of $187,233,693 in ill-gotten gains, plus $112,123,550.80 in prejudgment interest, for a total of $299,357,243.80.  *Id.* at 434; J.A. 1584.

informational advantage over the investing public."[7]   The District Court made clear, however, that the measure of disgorgement imposed by the September opinion "represents the best measure of the Wylys' ill-gotten gains," and thus held that the disgorgement described in the December opinion "may only be imposed in the event that a higher court disagrees with the measure of disgorgement imposed by the September 25 Order."[8]

Meanwhile, on October 8, 2014—shortly after the issuance of the September disgorgement opinion—the SEC requested by pre-motion letter an order for a temporary asset freeze, expedited financial discovery, an accounting of the Wyly Brothers' assets, and a freeze of those assets possessed by Wyly family members who had allegedly received ill-gotten gains traceable to the Wyly Brothers' fraud.[9]   In its pre-motion letter, the SEC expressed "particular[] concern[] about the potential dissipation of assets" by "third parties, such as the Wylys' family members and the offshore trustees."[10] Accordingly, the SEC requested an asset freeze applicable not only to Sam Wyly and the estate of Charles Wyly, but also extending to third parties, including family members, heirs, agents, and

---

[7] *SEC v. Wyly*, 71 F. Supp. 3d 399, 403-04 (S.D.N.Y. 2014).   The total amount of disgorgement under this alternative measure was calculated to be $174,967,561.   *SEC v. Wyly*, No. 10 Civ. 5760 (SAS), 2015 WL 427423, at *3 (S.D.N.Y. Feb. 2, 2015).

[8] *Wyly*, 71 F. Supp. 3d at 404.

[9] J.A. at 1554-55.

[10] *Id.* at 1554.

trustees.[11]  By letter of October 14, 2014, counsel representing the Wyly Brothers' interests opposed any order binding upon Wyly family members on the ground that the family members had not yet been named as relief defendants.[12]  Counsel representing the Wyly family members submitted letters on the same date joining in the Wyly Brothers' opposition to the SEC's request.[13]

On October 19, 2014, while the SEC's request for an asset freeze was still pending, Samuel Wyly filed a petition in Bankruptcy Court for Chapter 11 protection.  On October 23, 2014, Caroline Wyly, the widow of Charles Wyly and principal heir of his estate, filed her own bankruptcy case.  The Wylys immediately argued to the District Court that the SEC's then-pending motion for an asset freeze must be automatically stayed by operation of Bankruptcy Code § 362.[14]

Before adjudicating the SEC's motion for an asset freeze, the District Court held multiple hearings and entertained written submissions from all parties that would be affected by the freeze, including non-defendant family members not yet parties to this action.  On October 24, 2014, at the suggestion of the District Court and after objections from defendants and their families, the SEC

---

[11] *Id.*

[12] *Id.* at 1569-71.

[13] *Id.* at 1578-82.

[14] *Id.* at 1678-83, 2011-14.

filed an amended complaint adding sixteen Wyly family members—
the wives, daughters, sons, and sons-in-law of Samuel and Charles
Wyly—as Relief Defendants.[15]   The amended complaint principally
alleged that the Relief Defendants are in possession of ill-gotten
gains stemming from the Wyly Brothers' fraud.[16]

On November 3, 2014, the District Court granted the SEC's
requests for an asset freeze, expedited discovery, and an accounting
of the Wyly Brothers' assets.[17]   The freeze order extended to assets of
the family-member Relief Defendants "which were, at any time, the
property of the IOM Trusts and Companies" and any other assets
received from the Wyly Brothers after January 1, 2005.[18]   The asset
freeze explicitly exempted any income or assets *not* derived or
received from the IOM trusts or the Wylys.[19]   Additionally, the
freeze carved out living expenses of $15,000 per month ($180,000 per
annum) for each Relief Defendant except Caroline Wyly, in addition
to all medical expenses, all tuition and education-related expenses,
all taxes, reasonable legal fees and expenses, and certain
bankruptcy-related expenses.[20]   The freeze order also indicated that
the District Court would resolve on a case-by-case basis further

---

[15] *Id.* at 1811-28.

[16] *Id.*

[17] Special App'x at 1-9.

[18] *Id.* at 3.

[19] *Id.* at 4-5.

[20] *Id.* at 5.

requests for exemptions regarding the Relief Defendants' real estate holdings.[21] Since the entry of the asset freeze order, the District Court has approved multiple further accommodations for the Relief Defendants without objection from the SEC.

The District Court crafted the asset freeze order with an eye towards "working harmoniously and cooperatively with the bankruptcy court in Texas."[22] Accordingly, the Court ordered that the asset freeze remain in place only "until such time as . . . [the] assets have been scheduled and thereby are clearly under the control of the Bankruptcy Court."[23] By its terms, the asset freeze "will dissolve" as soon as the assets are under the Bankruptcy Court's control.[24]

Also on November 3, 2014, the District Court issued an accompanying opinion explaining the legal basis for the asset freeze order.[25] In that opinion, the District Court held that the Bankruptcy Code's automatic stay provision did *not* preclude the entry of its

---

[21] *Id.*

[22] J.A. at 1792.

[23] Special App'x at 4.

[24] *Id.* Ultimately, it will be the task of the Bankruptcy Court, not this one, to determine the scope of the bankruptcy estate. The asset freeze order thus provides that, when the Bankruptcy Court establishes control over all the assets contained within the estate, the order at issue will dissolve, and the Bankruptcy Court will continue its work without the involvement of the District Court. *Id.*

[25] *SEC v. Wyly*, 73 F. Supp. 3d 315 (S.D.N.Y. 2014).

asset freeze order, pursuant to this Court's controlling precedent in *SEC v. Brennan*.[26] The District Court reasoned that, in seeking the asset freeze order, the SEC was "acting in its police and regulatory capacity," and thus the Bankruptcy Code's automatic stay did not apply.[27] Having found no legal bar to issuing the asset freeze, the District Court further concluded that the freeze was warranted because the bankruptcy proceedings, then in their infancy, had not yet established control over the Wyly Brothers' assets, which remained at risk of transfer and dissipation, including by third parties offshore.[28] Finally, the District Court determined that the SEC was likely to show that the family-member Relief Defendants had received ill-gotten gains without any legitimate claim to those assets, fulfilling the applicable standard set forth in *SEC v. Cavanagh*.[29]

This appeal was then taken by all of the Relief Defendants except Caroline Wyly, the widow of Charles Wyly and beneficiary of his estate. She sought relief in the Bankruptcy Court instead. On January 9, 2015, the Bankruptcy Court rejected Caroline Wyly's argument that the automatic stay barred the SEC's action against her as a relief defendant.[30] Instead, the Bankruptcy Court ruled that, in

---

[26] 230 F.3d 65 (2d Cir. 2000).

[27] *Wyly*, 73 F. Supp. 3d at 320.

[28] *Id.* at 320-21.

[29] 155 F.3d 129 (2d Cir. 1998).

[30] *In re Wyly*, 526 B.R. 194 (Bankr. N.D. Tex. 2015).

seeking the asset freeze, the SEC was acting in its police and regulatory capacity, and it declined to enforce the automatic stay against the SEC.[31]

## DISCUSSION

On appeal, the fifteen family-member Relief Defendants challenge the freeze of their assets on three grounds.

*First*, they argue that the freeze order violates the Bankruptcy Code's automatic stay provision, because it constitutes an action by the SEC to collect an anticipated money judgment.

*Second*, they argue that, under the District Court's "tax avoidance" measure of disgorgement, the SEC has not shown as a matter of law that any Relief Defendants received assets that constitute "ill-gotten gains."

*Third*, they contend that the District Court erred or "abused its discretion" in applying the freeze order to seven of the Relief Defendants, because there is no record evidence that those individuals received any ill-gotten gains from the Wyly Brothers.

We review an asset freeze order for abuse of discretion.[32] "A district court has abused its discretion if it based its ruling on an

---

[31] *Id.* at 201. In the bankruptcy proceeding, Samuel and Caroline Wyly have filed schedules of assets and liabilities containing disclaimers that assets from the IOM trusts are property of the debtors' bankruptcy estates.

[32] *Smith v. SEC*, 653 F.3d 121, 127 (2d Cir. 2011).

erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the range of permissible decisions."[33]  We review underlying questions of fact for clear error, and underlying questions of law—such as the application of the Bankruptcy Code's automatic stay provision to the freeze order—*de novo*.[34]  We consider in turn each of these claims on appeal.

## I.  Asset Freeze Order and Automatic Stay

The Relief Defendants' first (and principal) claim—that the Bankruptcy Code's automatic stay provision precluded the issuance of the asset freeze order—tests the scope of this Court's opinion in *SEC v. Brennan*.  To evaluate it, we must first explore the meaning of the automatic stay provision, an exception to that provision, and an exception to the exception.

### A.  Applicable Law

Bankruptcy Code § 362 automatically stays virtually all proceedings against a debtor, including "any act to obtain possession of property of the estate or of property from the estate or

---

[33] *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (internal quotation marks, alteration, and citations omitted); *see also In re The City of New York*, 607 F.3d 923, 943 n.21 (2d Cir. 2010) (explaining that "abuse" is a nonpejorative "term of art").

[34] *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 206 (2d Cir. 2014).

to exercise control over property of the estate."[35]  The automatic stay of Section 362 thus serves "one of the core purposes of bankruptcy," by enabling "the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas."[36]

As relevant here, the Code also contains an exception to Section 362 known as the "governmental unit" exception, which provides that the automatic stay provision does *not* extend to

> the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment *other than a money judgment*, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.[37]

As we explained in *Brennan*, the purpose of the governmental unit exception "is to prevent a debtor from 'frustrating necessary

---

[35] 11 U.S.C. § 362(a)(3).  We assume without deciding that the non-debtor Relief Defendants may invoke the automatic stay provision in aid of their claims on appeal.

[36] *In re U.S. Lines, Inc.*, 197 F.3d 631, 640 (2d Cir. 1999) (quoting *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990)).

[37] 11 U.S.C. § 362(b)(4) (emphasis added).

governmental functions by seeking refuge in bankruptcy court.'"[38]
As the legislative history makes plain, "where a governmental unit
is suing a debtor to prevent or stop [a] violation [constituting] fraud
. . . or attempting to fix damages for violation of such a law, the
action or proceeding is *not* stayed under the automatic stay."[39]

In the instant case, all parties agree that the SEC's regulatory
enforcement action against the Wyly Brothers falls within the
governmental unit exception.[40] The Relief Defendants assert,
however, that this case falls under an exception to the governmental
unit exception. This "exception to the exception" provides that
actions to enforce money judgments *are* subject to the automatic
stay, even if they were otherwise pursued by a governmental unit in
furtherance of the government's police or regulatory powers.[41]
Accordingly, the Relief Defendants argue that the asset freeze order
is subject to the automatic stay. The SEC counters that the asset
freeze order does *not* fall within the money judgment "exception to
the exception" and hence does *not* trigger the automatic stay. Both
parties invoke the case of *SEC v. Brennan* in aid of their positions.

---

[38] 230 F.3d at 71 (quoting *City of New York v. Exxon Corp.*, 932 F.2d 1020,
1024 (2d Cir. 1991)).

[39] H.R. REP. No. 95-595, at 343 (1977), U.S. Code Cong. & Admin. News at
6299 (emphasis added); *accord* S. REP. No. 95-989, at 52 (1978), U.S. Code Cong. &
Admin. News at 5838.

[40] *See* Defs.' Br. at 15; Pl. Br. at 23.

[41] *See Brennan*, 230 F.3d at 71 (quoting *Penn Terra Ltd. v. Dep't of Envtl. Res.*,
733 F.2d 267, 272 (3d Cir. 1984)).

That case, like this one, involved a defendant found liable for securities fraud in an SEC enforcement action, who subsequently filed for bankruptcy protection. Like the Relief Defendants here, the defendant in *Brennan* then argued that an order in the SEC enforcement action violated the Bankruptcy Code's automatic stay provision. The order at issue required the defendant to repatriate to the United States assets held in offshore protection trusts and deposit them in a court registry. We vacated the repatriation and deposit order in *Brennan*. Calling the question "a close one," we nonetheless found that it constituted a step "preparatory to money collection" that fit within the "exception to the exception" and was thus foreclosed by the operative automatic stay provision.[42]

The critical question here is whether the asset freeze order at issue was a permissible use of the government's regulatory power under the "governmental unit exception," or whether, like its analogue in *Brennan*, it was an impermissible action to enforce a money judgment under the "exception to the exception." The District Court carefully analyzed our reasons for vacating the repatriation and deposit order in *Brennan* and found that the asset freeze at issue here was a permissible use of the government's regulatory power under the "governmental unit exception."[43]

---

[42] *Id.* at 71-72 (internal quotation marks omitted).

[43] *Wyly*, 73 F. Supp. 3d at 320.

18

We agree. On *de novo* review, we hold that the District Court correctly interpreted our controlling precedent in *SEC v. Brennan* and properly concluded that this asset freeze order is exempt from the Bankruptcy Code's automatic stay provision.

Factual, procedural, and policy considerations distinguish this case from *Brennan* and lead to our conclusion that this asset freeze order falls within the "governmental unit exception" but *not* within the "exception to the exception" for actions to enforce a money judgment. We explain each of these considerations below.

## B. The Factual Nature of the Order

First, the order at issue here differs significantly from the order in *Brennan*. There, we vacated an order directing the debtor to repatriate assets held abroad and deposit them in a court registry. Here, the applicable order is merely an asset freeze, which, unlike the order in *Brennan*, neither transfers ownership, nor vests control over assets in the courts, nor—given its numerous exemptions for legal, medical, educational, and other uses, as well as generous living expenses—entirely deprives the Relief Defendants of their use. To be sure, the asset freeze order entered by the District Court does temporarily burden the use of certain assets. It does not, however, rise to the level of impermissible *enforcement* of a money judgment. Unlike the repatriation and deposit order in *Brennan*, the asset freeze seeks not to modify or transfer assets in any way, but rather, merely to "preserve the status quo in anticipation of a final

judgment."[44]  We regarded as "a close one" the question of whether *Brennan*'s substantially more burdensome repatriation and deposit order constituted enforcement of a money judgment.[45]  The significantly less onerous asset freeze at issue here falls on the other side of the line.

Relief Defendants attempt to characterize the freeze as an impermissible "step []preparatory to money collection" that is functionally equivalent to *Brennan*'s repatriation and registry deposit order.[46]  The argument is strained and unpersuasive.  By that logic, many or most aspects of statutorily unstayed governmental unit actions could be characterized as "steps preparatory to money collection," so long as the initial complaint sought monetary relief.  We decline to adopt the interpretation of the exception urged by Relief Defendants, which would effectively swallow the rule.

### C.  Procedural Posture

As the District Court noted, the procedural posture of this case also significantly differs from that of *Brennan*.  There, the repatriation and deposit order arose as part of the SEC's post-

---

[44] *Id*.

[45] *Brennan*, 230 F.3d at 71.

[46] Defs.' Br. at 15-16.

judgment collection procedures.[47]   Here, the November 2014 asset freeze order was imposed *before* the entry of final judgment on February 26, 2015 as to the Wyly Brothers.[48]

In *Brennan*, we instructed that "the line between [unstayed] police or regulatory power on the one hand, and [stayed] enforcement of a money judgment on the other, [must] be drawn at entry of judgment."[49]   In other words, "up to the moment when liability is definitively fixed by entry of judgment, the government is acting in its police or regulatory capacity. . . .   However, once liability is fixed and a money judgment has been entered, the government necessarily acts only to vindicate its own interest in collecting its judgment."[50]

The pre-judgment asset freeze at issue here thus does not implicate the same concerns as did the post-judgment repatriation and deposit order in *Brennan*.   Moreover, the SEC persuasively

---

[47] The repatriation and deposit order was issued after the SEC moved for an *ex parte* order to show cause as to why Brennan should not be held in civil contempt for failing to comply with the disgorgement order.

[48] On July 7, 2015, the District Court denied the Wylys' motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or, in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59. On September 4, 2015, the Wylys filed a notice of appeal as to the February 26, 2015 final judgment and the July 7, 2015 order denying their Rule 50(b) and Rule 59 motions.

[49] 230 F.3d at 72 (internal quotation marks and alteration omitted).

[50] *Id.* at 73.

argues that the relevant judgment is not the one entered in February 2015 against the Wyly Brothers, but rather, the judgment which has yet to be entered against the Relief Defendants, who only answered the complaint against them in April 2015.

Even if the February 2015 judgment against the Wyly Brothers were the operative judgment, however, the later-occurring entry of final judgment alone does not operate to transform a permissible pre-judgment asset freeze into an impermissible post-judgment enforcement act. We did not intend in *Brennan* to impose a one-factor timing test whereby orders entered pre-judgment are always exempt from the automatic stay provision while orders entered (or with continuing force) post-judgment are always subject to the stay. As the Relief Defendants note, such a simplistic standard could permit procedural end-runs that would defeat the spirit and purpose of the statute, whereby any manner of incursion would be permitted so long as it technically predated the entry of a final judgment. To be sure, the timing of the order's entry constitutes a crucial factor in our analysis, but it is not invariably dispositive.[51]

---

[51] We note that the timing here neatly exemplifies the distinction between the asset freeze order in this case and the repatriation and deposit order that violated the automatic stay in *Brennan*. Asset freeze orders like the one entered here are routinely issued pre-judgment in actions for equitable remedies, well before damages have been fixed or a money judgment entered. *See, e.g., Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 131 (2d Cir. 2014) (noting that district courts have equitable power to issue a pre-judgment asset freeze where such relief was traditionally available). By contrast, repatriation and deposit orders, like the one

Consistent with the statutory imperative, our focus remains whether a given order constitutes "enforcement of a judgment other than a money judgment."[52]  Here, the asset freeze did not enforce a money judgment because, as of the date of issuance of the freeze order, no judgment had yet been entered.

### D.  Policy Concerns

Finally, the policy concerns underlying the disposition in *Brennan* weigh in favor of a different outcome here.  In *Brennan*, we concluded that "the policies behind § 362 as a whole weigh strongly in favor of applying the automatic stay in these circumstances."[53] We cited two specific policies: (1) the general purpose of the automatic stay "to allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas,"[54] and (2) the general purpose of the governmental unit exception "to prevent a debtor from 'frustrating necessary governmental functions by seeking refuge in bankruptcy court.'"[55]

---

vacated in *Brennan*, are typically reserved for post-judgment collection proceedings.

[52] 11 U.S.C. § 362(b)(4).

[53] 230 F.3d at 75.

[54] *Id.* (quoting *In re United States Lines, Inc.*, 197 F.3d at 640).

[55] *Id.* (quoting *Exxon Corp.*, 932 F.2d at 1024).

In this case, the asset freeze order does not jeopardize either of these policy objectives; on the contrary, it complements both. In *Brennan*, the SEC had tried and failed to obtain from the Bankruptcy Court a repatriation order for the offshore trusts. Only after that failure did the SEC seek in the district court precisely the same relief that the Bankruptcy Court had previously rejected. Thus, the specter of forum-shopping and inefficient, uncoordinated proceedings loomed large in our analysis of the policy concerns presented in *Brennan*.

Not so here. No conflict exists between the proceedings in the District Court and those in the Bankruptcy Court. This asset freeze order is narrowly framed to exclude assets in the bankruptcy proceeding and to be lifted as soon as the assets are clearly under the control of the Bankruptcy Court. Indeed, the Bankruptcy Court itself endorsed the freeze as "neatly avoiding duplication of judicial effort between the SEC Action and these bankruptcy cases."[56] What is more, the Bankruptcy Court determined that enforcing the automatic stay "may ultimately accomplish little" since the SEC would likely seek relief from the stay to proceed against the Relief Defendants in its enforcement action.[57] Though it stopped short of deciding such a hypothetical motion, the Bankruptcy Court strongly indicated its own inclination to avoid extending the automatic stay to cover this case: "From the standpoint of judicial economy, it

---

[56] *In re Wyly*, 526 B.R. at 196 n.4.

[57] *Id.* at 202.

likely would make the most sense for the District Court, in one coordinated proceeding, to liquidate the amount of alleged ill-gotten gains of the securities fraud that all relief defendants allegedly received and still possess."[58]

Under these circumstances, the entry of the asset freeze order here does not contravene the first policy of "centraliz[ing] all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas."[59] Moreover, the asset freeze order is fully consistent with the second policy of "prevent[ing] a debtor from frustrating necessary governmental functions by seeking refuge in bankruptcy court."[60] The Wylys initiated bankruptcy proceedings and invoked the automatic stay mere days after the SEC filed its then-pending motion for an asset freeze. The timing speaks loudly for itself.

Finally, there is reason to doubt the Relief Defendants' representation that the District Court's involvement is unnecessary because "the frozen assets are property of the bankruptcy estates [of the Wyly Brothers] . . . [and therefore] are under the exclusive jurisdiction of the Bankruptcy Court."[61] In their bankruptcy

---

[58] *Id.*

[59] *Brennan*, 230 F.3d at 75 (quoting *In re United States Lines, Inc.*, 197 F.3d at 640).

[60] *Id.* (quoting *Exxon Corp.*, 932 F.2d at 1024).

[61] Defs.' Br. at 13-14.

proceedings, Samuel and Caroline Wyly have refused to take a position on whether they own the IOM trust assets, leaving in doubt whether they fall within the bankruptcy court's jurisdiction.[62] Further, the Bankruptcy Court may not be able to address dissipation of offshore assets by third parties, which some evidence suggests may be already underway.[63] Notwithstanding the ongoing bankruptcy proceedings, there is a clear need for the independent asset freeze to preserve the status quo.

In light of the legal, factual, procedural, and policy concerns at issue here, we conclude that the asset freeze order is consistent with the Bankruptcy Code's automatic stay provision and our governing precedent in *Brennan*.

## II. Receipt of Ill-Gotten Gains

We turn next to the Relief Defendants' two-part challenge to the scope of the asset freeze order. Equitable relief against a third-party non-wrongdoer may be entered where such an individual "(1) has received ill-gotten funds; and (2) does not have a legitimate

---

[62] *Wyly*, 73 F. Supp. 3d at 321 & n.20. Similarly, in their briefing here, Relief Defendants carefully avoid claiming (or disclaiming) the IOM trust assets on behalf of the Wyly Brothers. *See* Defs.' Br. at 13 ("*The SEC takes the position* that assets transferred to the relief defendants by the Wyly Brothers or the offshore entities are either owned or controlled by the Wyly Brothers. . . . Thus, *according to the SEC*, the frozen assets are property of the bankruptcy estates of Sam Wyly and Charles Wyly's widow . . . ." (emphasis added)).

[63] *Wyly*, 73 F. Supp. 3d at 320 & n.19.

claim to those funds."[64]  Courts require a "lesser showing" to enter an asset freeze order than is needed for other forms of equitable relief.[65]  To obtain an asset freeze order, the SEC "must establish only that it is likely to succeed on the merits."[66]

It is undisputed that defendants have no legitimate claim to the funds in the IOM trusts.  Rather, the Relief Defendants focus their arguments on the first prong of the *Cavanagh* test.  First, they contend that the SEC cannot show the receipt of ill-gotten gains "as a matter of law," because the District Court measured disgorgement by the amount of taxes avoided by the Wyly Brothers.[67]  Because tax savings "are personal to the taxpayers," the Relief Defendants assert that the Wyly Brothers "did not—and as a matter of law could not—transfer them to family members or anyone else."[68]

This argument misunderstands the nature of the District Court's disgorgement order.  As a general matter, disgorgement is an "equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific

---

[64] *Cavanagh*, 155 F.3d at 136.

[65] *Id.* at 132.

[66] *Id.*  As noted above, *see* notes 32-34 *ante*, we review an asset freeze order for abuse of discretion, *see Smith*, 653 F.3d at 127; we review the underlying legal conclusions *de novo* and factual determinations for clear error, *see Cayuga Indian Nation v. Seneca Cty.*, 761 F.3d 218, 220 (2d Cir. 2014).

[67] Defs.' Br. at 19-20.

[68] *Id.* at 20.

asset."[69]  Understanding this distinction, the District Court explained that it was not limited to ordering disgorgement of "the actual property obtained *by means of* his wrongful act."[70]

In its September opinion explaining its disgorgement order, the District Court emphasized that "this is *not* a civil action for the collection or recovery of taxes . . . .  Rather, this is a civil action for securities law violations, the *remedy* for which is measured by the amount of taxes avoided as a result of the defendants' securities violations."[71]  The Court made clear that "[m]easuring unjust enrichment by approximating avoided taxes does not transform an order of disgorgement into an assessment of tax liability."[72]

Since the tax avoidance sum merely served the purpose of quantifying the disgorgement remedy, rather than forming the basis for liability itself, it is irrelevant that—or whether—tax liability is

---

[69] *Wyly*, 56 F. Supp. 3d at 431 n.223 (quoting *SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000)).  As the D.C. Circuit has explained, to hold otherwise "would lead to absurd results," including, for example, enabling "a defendant who was careful to spend all the proceeds of his fraudulent scheme, while husbanding his other assets, [to be] immune from an order of disgorgement."  *Banner Fund Int'l*, 211 F.3d at 617.

[70] *Wyly*, 56 F. Supp. 3d at 430 (emphasis in original).

[71] *Id.* at 425 (emphasis in original) (internal quotation marks omitted) (quoting its own earlier summary judgment decision in *SEC v. Wyly*, No. 10 Civ. 5760 (SAS), 2013 WL 2951960, at *1 (S.D.N.Y. June 13, 2013)).

[72] *Id.*

non-transferable.[73]  What matters is that the gains received were ill-gotten in violation of securities laws, a determination that has already been made by the jury at trial.  That conclusion is not disturbed by the particular measure used by the District Court to order equitable relief.  Here, the District Court's adoption of two alternative measures of disgorgement in its September and December opinions makes the point even more salient.[74]  The Relief Defendants challenge only the tax measure set forth in the September opinion.  In fact, the particular method of measurement used is immaterial.

### III.  Receipt by Certain Relief Defendants

Finally, we address the Relief Defendants' second challenge to the scope of the asset freeze order, in which they argue that there is insufficient evidence to show that seven of the Relief Defendants—Andrew Wyly, Christiana Wyly, Charles J. Wyly, III, John Graham, David Matthews, Donnie Miller, and Evan Wyly—received funds from the IOM trusts or the Wyly Brothers directly.  These seven defendants request vacatur of the asset freeze order as to them.[75]

---

[73] Though we need not reach the issue, we note that the SEC presents countervailing arguments and precedent indicating that unlawful tax savings *are* transferable.  *See* Pl. Br. at 43-45.

[74] As previously noted, the alternative calculation set forth in the December disgorgement opinion was only to be used if the September disgorgement method failed on appeal.

[75] Defs.' Br. at 21-22; Defs.' Reply Br. at 11-15.

Treating the Relief Defendants as being all similarly situated, the District Court stated, without further elaboration or individuation, that the IOM trusts "have made distributions to the Family Members[;] [t]hus, the Family Members are likely in possession of ill-gotten funds."[76]  Seven Relief Defendants challenge this finding as baseless, and the SEC has presented no evidence of the alleged distributions cited by the District Court as to these defendants.  Three Relief Defendants—Andrew Wyly, Christiana Wyly, and Evan Wyly—are named beneficiaries of the IOM trusts, but the record on appeal does not reflect distributions to them from these trusts.  Four other Relief Defendants—Charles J. Wyly, III, Donald Miller, John Graham, and David Matthews—appear to have possessed trust property, including jewelry, artwork, furnishings and residences, but the District Court did not rely on this evidence in fashioning its asset freeze order.

Unable to offer concrete evidence of these alleged distributions, the SEC instead argues that these seven defendants have nothing to complain of if they do not possess assets frozen by the order.  This argument must be rejected.  We require a showing of receipt of ill-gotten gains consistent with *Cavanagh* before an individual can be subject to an asset freeze order.  The SEC's position would render the *Cavanagh* requirement meaningless and would sever the very connection permitting relief defendants to be

---

[76] *Wyly*, 73 F. Supp. 3d at 322.

joined to an action without an assertion of wrongdoing or other grounds for subject matter jurisdiction over them.[77]

On this record, we cannot know, much less decide, whether the District Court clearly erred in determining that the IOM trusts "made distributions" to each of the Relief Defendants. We thus think it prudent to remand the cause to the District Court for further individualized findings regarding trust distributions to these seven Relief Defendants. Given its greater familiarity with the record evidence and the evidence adduced at trial, the District Court should rely on specific facts from the record showing receipt of ill-gotten gains by these individual defendants or, to the extent it deems necessary, undertake further fact-finding. If the requisite evidence does not exist with respect to any or all of the seven Relief Defendants, the asset freeze order should be vacated as to those individuals.

## CONCLUSION

This case presents us with the opportunity to clarify and delimit the scope of *SEC v. Brennan*. There, the facts and circumstances weighed in favor of staying the order requiring the defendant to repatriate assets and deposit them in a court registry.

---

[77] *See Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 (4th Cir. 2002) (noting that a nominal defendant with no ownership interest in the funds at issue "is part of a suit only as the holder of assets that must be recovered in order to afford complete relief").

Here, the balance of factors requires a different result. We therefore hold as follows:

(1)    The pre-judgment asset freeze order imposed by the District Court was exempt from the Bankruptcy Code's automatic stay provision. The asset freeze order at issue here did not seek to enforce a money judgment and thus fell within the "governmental unit" exception to the stay provision, but not within the "exception to the exception."

(2)    The order was properly supported by a showing of receipt of ill-gotten gains by nine of the sixteen Relief Defendants.

Accordingly, we **AFFIRM** in part the District Court's November 3, 2014 asset freeze order insofar as it restrained the assets of these nine Relief Defendants.

(3)    We are unable to determine on this record whether seven of the sixteen Relief Defendants personally received ill-gotten gains.

Accordingly, we **REMAND** the cause to the District Court for additional factual development on the limited issue of whether these seven Relief Defendants received ill-gotten gains.

In the interest of judicial economy, any future appeals taken from the District Court's decisions shall be referred to this panel.